UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

PAUL ALLEN ADAMS,

               Plaintiff,

                                          Case No. 18-cv-1557-pp

    v.

CHARLES LARSON, *et al.*,

               Defendants.

**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS'
MOTIONS FOR SUMMARY JUDGMENT (DKT. NOS. 40, 48)**

The plaintiff, who is representing himself, filed this lawsuit under 42
U.S.C. §1983. He is proceeding against the defendants based on his allegations
that they were deliberately indifferent to his knee pain. Dkt. No. 10 at 6-7. On
August 12, 2019, defendants Robert Frank, Anthony Hentz, Randall Hepp,
Diane Huber, Pauline Hulstein, Charles Larson, Tammy Massen, Deborah
Tidquist and Candace Whitman filed a motion for summary judgment. Dkt. No.
40. The next day, defendant Fern Springs filed a motion for summary
judgment. Dkt. No. 48. Both motions are fully briefed.[1]

---

[1] The plaintiff filed his materials in response to Dr. Fern Springs' motion on
October 30, 2019. Dkt. Nos. 68-71. Under Civ. L. R. 56(b)(3), Dr. Springs' reply
in support of her motion was due within fourteen days of service of the
plaintiff's response materials. Dr. Springs filed her reply on December 10,
2019, more than forty days after the plaintiff served his response materials. Dr.
Springs did not request an extension of the deadline to reply or explain why
she filed her reply so long after the deadline. Accordingly, at the plaintiff's
request, dkt. no. 84, the court will disregard Dr. Springs' reply.

1

## I. Relevant Facts[2]

### A. The Parties

The plaintiff was confined at Fox Lake Correctional Institution from August 28, 2014 until May 10, 2018; at Chippewa Valley Correctional Treatment Facility from May 10, 2018 until June 26, 2018; and at Jackson Correctional Institution from June 26, 2018, until December 10, 2018. Dkt. No. 47 at ¶¶8, 54, 58. While the plaintiff was confined at Fox Lake, Frank was an Advanced Practice Nurse Prescriber (APNP), Whitman was the health services manager, Larson was a medical doctor and Hepp was the warden. Id. at ¶2, 10. While the plaintiff was confined at Chippewa Valley, defendant Springs was a medical doctor. Dkt. No. 50 at ¶5. While the plaintiff was confined at Jackson, Tidquist was an Advanced Practice Nurse Prescriber (APNP), Maassen was the health services manager, Hentz and Hulstein were nurses and Huber was an offsite scheduler. Dkt. No. 47 at ¶3.

According to the defendants, advance care providers and nurses provide direct medical care to the inmates. Dkt. No. 47 at ¶5. Health services managers generally are not involved in direct patient care; they provide overall

---

[2] The plaintiff filed his own sets of proposed facts. Dkt. Nos. 70, 77. The plaintiff's proposed facts and his responses to the defendants' proposed facts do not comply with the Federal Rules of Civil Procedure or the court's local rules. See Fed. R. Civ. P. 56; Civil L.R. 56(b)(2)(B)(ii) (E.D. Wis.). Nearly every numbered paragraph contains multiple facts, is argumentative, contains inadmissible hearsay and is only occasionally supported by the record. The court will consider the plaintiff's assertions "only to the extent they are clearly and obviously supported by citations to the [] record" and cite admissible evidence. Jenkins v. Syed, 781 F. App'x 543, 545 (7th Cir. 2019); Carlisle v. Deere & Co., 576 F.3d 649, 655 (7th Cir. 2009) (explaining that, to defeat a motion for summary judgment, a party "may rely only on admissible evidence").

administrative support and direction of health services. Id. Further, health services managers and nurses are not authorized to prescribe medications; they may provide only non-prescription medications such as Tylenol. Id. at ¶6. Only physicians and nurse practitioners may prescribe medications. Id.

### 1. *Fox Lake Correctional Institution*

Starting in 2015, APNP Frank assumed primary care for the plaintiff. Dkt. No. 47 at ¶10. The defendants assert that throughout the time APNP Frank was treating the plaintiff, the plaintiff would complain about joint pain and fatigue generally; however, it was not until February 9, 2017 that he first complained about knee pain specifically. Id. at ¶¶11, 13. The plaintiff asserts that he complained about his knee pain prior to February 9, 2017, but Frank told him to focus on his Hep C treatment first. Dkt. No. 75 at ¶¶11-13. The plaintiff explains that, after his third Hep C treatment was finished, he reminded Frank that Frank had said he would deal with the plaintiff's knee pain. Id. at ¶13. The plaintiff told Frank that the pain was waking him up at night and that it was sometimes difficult for him to walk to health services. Id. at ¶14.

Frank examined the plaintiff's knee and did not observe any swelling, redness, loose ligament or crackling, but he did note a nodule (which was about 1.5 cm in diameter) that the plaintiff said was very tender to the touch. Dkt. No. 47 at ¶15; Dkt. No. 75 at ¶15. Frank ordered an x-ray and follow-up appointment. Dkt. No. 47 at ¶16. Frank explains that he did not believe further

treatment or pain medication was necessary at that time because the plaintiff already was receiving pain medication for other conditions. Id. at ¶17.

The plaintiff's knee was x-rayed less than a week later, on February 17, 2017. Dkt. No. 47 at ¶18. The x-ray showed that the joint was intact, with no fracture or dislocation, and no effusion (drainage); overall, the x-ray showed that the knee was normal. Id. Frank saw the plaintiff a few weeks later for a follow-up appointment. Id. at ¶19. He recommended a cortisone shot in the knee joint to address the pain. Id. at ¶20. He ordered it to be scheduled after the plaintiff's already-scheduled FibroScan for his cirrhosis. Id. (Frank does not explain why he decided to wait until after the FibroScan.)

A couple of months later, on April 11, 2017, Frank renewed the plaintiff's prescription for acetaminophen (APAP or Tylenol). Dkt. No. 47 at ¶21. Frank explains that the plaintiff was allowed to use up to 325 mg as needed for six months, with a limit of two bottles per month. Id. The plaintiff asserts that Tylenol is harmful to his liver (he provides no support for this assertion), and argues that it did not help relieve his knee pain. Dkt. No. 75 at ¶21.

The next month, on May 4, 2017, Frank saw the plaintiff for multiple issues, including his knee pain. Dkt. No. 47 at ¶22. He asserts that he again reviewed the x-ray results. Id. Frank says he believed the "diagnosis could be degenerative joint disorder, or osteoarthritis, which are both results of normal aging and wear and tear." Dkt. No. 42 at ¶15. By then, the plaintiff had completed his FibroScan, so Frank offered the plaintiff a cortisone shot. Id. According to Frank, he gave the plaintiff the shot that same day, and the

4

plaintiff tolerated it well. Id. The plaintiff asserts that he had no choice but to accept the shot; he says that Frank told him he had to try at least one or two shots or he was unlikely to be approved to receive an MRI. Dkt. No. 75 at ¶23. Frank advised the plaintiff to avoid strenuous activity, elevate his knee and reduce pressure on his joint. Dkt. No. 47 at ¶24. He also referred the plaintiff to physical therapy for evaluation and treatment. Id. He ordered a follow-up appointment for two to three months. Id.

About four months later, on August 30, 2017, the plaintiff again complained to Frank about his knee pain; he said he had stiffness and pain in the morning or after he worked out. Dkt No. 47 at ¶25. According to the plaintiff, he had been to health services between 150 and 300 times (the timeframe during which these visits occurred is not clear). Dkt. No. 75 at ¶25. The plaintiff asserts that his knee hurt every time he had to walk to health services, and he voiced his pain every time. Id. (The plaintiff does not specify to whom he voiced his complaints.) Frank offered the plaintiff another cortisone shot, but the plaintiff declined. Dkt. No. 47 at ¶26.

The plaintiff explains that Frank told him he had already made a recommendation for an outside consult, and that Frank did not think a shot would help. Dkt. No. 75 at ¶26. The plaintiff also asserts that Frank apologized to him for having to "go through the motions" to get an offsite consultation approved. Id. at ¶27. According to the plaintiff, Frank told him he had asked Dr. Larson if Larson would consider prescribing better pain medications and/or a sleep aid for the plaintiff, but Larson said no. Id.

5

According to the defendants, the plaintiff was seen in health services about thirty times from April 11, 2017 through August 30, 2017 for treatment of other medical issues, and he never mentioned his knee pain. Dkt. No. 47 at ¶28. They also assert that on October 12, 2017, the plaintiff told the physical therapist that he had intermittent pain while sleeping or sitting and that Tylenol helped ease the pain. Id. at ¶29. The plaintiff denies the defendants' characterization. He asserts that he told the physical therapist that he was in constant pain and that Tylenol did not help. Dkt. No. 75 at ¶29.

To address the plaintiff's complaints of pain, the physical therapist ordered a trial of iontophoresis, which is a process of transdermal drug delivery by use of a voltage gradient on the skin. Dkt. No. 47 at ¶30. The plaintiff asserts that it made his pain worse. Dkt. No. 75 at ¶30. About six weeks later, on November 30, 2017, Frank recommended an orthopedic specialist consult for the plaintiff's knee and ordered an extra blanket for him to put between his knees when he slept (the plaintiff asserts the guards would not let him have the blanket). Dkt. No. 47 at ¶¶31-32; Dkt. No. 75 at ¶¶31-32. Frank did not provide any additional knee care to the plaintiff after this appointment. Dkt. No. 47 at ¶33.

A little more than a month and a half later, on January 18, 2018, Dr. Larson saw the plaintiff for complaints of knee pain. Dkt. No. 47 at ¶35. Larson explains that the medical records showed that the plaintiff had seen several nurse practitioners and a physical therapist, had had an x-ray, had been prescribed Tylenol for pain, had received one cortisone shot and rejected

6

another and had been referred to a Waupun Memorial Hospital orthopedic specialist. Id. at ¶36. Larson also prescribed Capsaicin cream, which is medicated cream that causes the sensation of heat to help relieve muscle and joint pain. Id. at ¶37. Larson explains that further treatment at that time was not warranted because the nodule (a common term used to describe a lump before there is a formal diagnosis) "was very minor." Id.

Larson explains that he saw the plaintiff again for knee pain complaints six days later, on January 24, 2018. Dkt. No. 47 at ¶40. According to Larson, because the plaintiff had just been seen six days earlier, he decided to attempt a quicker resolution of the nodule-related pain and have the nodule removed in health services. Id. The plaintiff explains that he told Larson that he wanted whatever needed to be done to stop the pain so he could sleep. See Dkt. No. 78 at 24.

Larson canceled the plaintiff's orthopedic consult and scheduled him to see Dr. Richard Steliga,[3] who worked for the Department of Corrections and specialized in general surgery. Dkt. No. 47 at ¶¶40-41. Larson explains that he did not believe the plaintiff's knee nodule required evaluation by an orthopedic specialist because the nodule was small, superficial and did not involve the structure of the knee joint. Id. at ¶44. In addition, medical records showed the knee's structure was normal and the plaintiff had normal range of motion and strength. Id.

---

[3] Dr. Steliga died before the plaintiff initiated this lawsuit. The court dismissed him as a defendant on June 18, 2019. Dkt. No. 38.

7

Larson asserts that Steliga could perform a nodule removal in health services, which he hoped would resolve the plaintiff's pain more quickly. Dkt. No. 47 at ¶42. Larson explains that Steliga could see inmates more quickly than they could be scheduled for an offsite consult with a specialist, and so Larson regularly made appointments with Steliga for minor procedures such as the removal of moles, nodules and cysts. Id. at ¶43.

The plaintiff disagrees with Larson's assessment. See Dkt. No. 75 at ¶¶41-45. The plaintiff maintains that his offsite consult was scheduled for less than a month out when Larson cancelled it. Although the plaintiff saw Steliga on February 6, 2018, Steliga merely ordered additional tests. Dkt. No. 47 at ¶46. Steliga finally decided how to proceed about three months after the original consult was cancelled; he decided to order another consult. Dkt. No. 75 at ¶¶41-45; Dkt. No. 80 at ¶33. The plaintiff concludes that Larson's action in canceling the orthopedic consult delayed the plaintiff's treatment by about four months until another appointment could be scheduled. Dkt. No. 75 at ¶44.

At the February 6, 2018 appointment, Steliga recommended an updated x-ray, an ultrasound and a follow-up appointment. Dkt. No. 47 at ¶46 The plaintiff saw Steliga again a little more than a month later, on March 17, 2018. Id. at ¶48. According to Larson, the plaintiff expressed discomfort with Steliga removing the nodule and verbalized his preference to see an orthopedic specialist. Id. at ¶49. It is not clear how Larson knows the plaintiff made these representations to Steliga. The medical documents Larson cites in support of

8

these assertions make no mention of the plaintiff insisting on seeing an orthopedic specialist. <u>See</u> Dkt. No. 43 at ¶¶18-19 (citing Dkt. No. 41-3 at 121, 123.)

The plaintiff denies that he refused to let Steliga remove the nodule. Dkt. No. 75 at ¶48; Dkt. No. 80 at ¶¶3-5. He asserts that he was willing to do anything to stop the pain. Dkt. No. 75 at ¶49; Dkt. No. 80 at ¶33. The defendants point out that, when complaining to Hepp, the plaintiff said, "Larson also believes that a DOC 'surgeon' can cut open my knee here in HSU using a local. That is madness." Dkt. No. 78 at 29. The plaintiff asserts, however, that he made these statements after Steliga told him he was uncomfortable removing the nodule without first getting an MRI. Dkt No. 75 at ¶49.

Steliga renewed the plaintiff's referral to the orthopedic specialist and gave the plaintiff a prescription for Benadryl. <u>Id.</u> at ¶48. Larson clarifies that during his examination of the plaintiff, he did not find any objective evidence of issues requiring immediate medical intervention or that would cause the extreme pain the plaintiff was reporting. <u>Id.</u> at ¶¶51. Accordingly, he thought it would have been equally reasonable to monitor the knee, provide low-grade pain treatment (such as was already being provided) and seek no additional treatment intervention at that time. <u>Id.</u> at ¶52.

About a month after seeing Steliga, on April 23, 2018, the plaintiff saw Dr. Eric Nelson, an orthopedic specialist. Dkt. No. 47 at ¶50. Nelson requested an MRI without contrast of the knee and a follow-up appointment. <u>Id.</u> at ¶50.

9

He noted that the plaintiff had "a hypersensitive nodule" that he had had for about a year and a half. Dkt. No. 78 at 121. Nelson stated that the "[h]ypersensitivity and location could suggest nerve based tumor such as schwannoma," although he did not make an official diagnosis of that condition. Id. at 122; Dkt. No. 80 at ¶37. He also explained that, while the plaintiff requested for the nodule to be removed, he thought "we should get more information before doing a surgical excision." Dkt. No. 78 at 122. Nelson's report is silent about the plaintiff's pain medications. Id.

The plaintiff explains that he wrote to Hepp and wrote and spoke to Whitman numerous times complaining about the lack of treatment he was receiving in response to his complaints of knee pain and sleep disturbances. Dkt. No. 77 at ¶¶20, 21, 22, 23, 24, 26, 29, 30, 31, 33, 35. According to the plaintiff, they told him that they had followed up with his health care providers and they did not think he needed additional pain medications. Id. at ¶21, 22. The plaintiff was transferred to Chippewa Valley on May 10, 2018. Dkt. No. 47 at ¶53. Larson did not provide any further treatment to the plaintiff. Id.

2.   *Chippewa Valley Correctional Treatment Facility*

Chippewa Valley is a drug treatment rehabilitation center. Dkt. No. 50 at ¶7. The plaintiff was incarcerated there from May 10, 2018 through June 26, 2018. Id. at ¶14. When he arrived, Dr. Springs was aware that the plaintiff had been seen at Waupun Memorial Hospital and that the physician there had recommended that an MRI be taken of the plaintiff's knee to determine the cause of the plaintiff's pain. Id. at ¶17. On May 11, 2018, the day after the

plaintiff arrived, the plaintiff submitted a request for medical attention stating that he was in a significant amount of pain and that he needed a non-narcotic in addition to his Tylenol. Id. at ¶20. The plaintiff also asked for other medications, ointments and an elevator pass. Id. Medical staff saw the plaintiff twice that same day and told him that he had an MRI scheduled with a follow-up appointment after that, at which time they could talk about pain medication. Id. at ¶21.

A few days later, on May 15, 2018, the plaintiff submitted another medical request form explaining that he was in pain every night and there must be a non-narcotic better than Tylenol. Dkt. No. 50 at ¶22. That same day, Springs refilled the plaintiff's Capsaicin cream (.025% three times per day as needed) and left his Tylenol prescription in effect. Id. at ¶26. The plaintiff highlights that Springs did not continue his prescription for Benadryl, which Steliga has prescribed as a sleep aid. Dkt. No. 69 at ¶¶23-24. According to the plaintiff, Springs encouraged him to meditate to deal with his chronic pain and sleep disturbances. Id. at ¶26.

On May 17, 2018, medical staff examined the plaintiff for several complaints. Dkt. No. 50 at ¶27. The plaintiff mentioned that he wanted something stronger than Capsaicin cream to deal with his pain. Id. at ¶28. Medical staff conveyed the plaintiff's request to Springs, who advised the nurse that the plaintiff could discuss medications at his appointment following the scheduled MRI. Id. at ¶¶28-29.

Springs explains that drug seeking is a common occurrence at Chippewa Valley. Id. at ¶23. In her experience, inmates seeking stronger non-narcotic medication are typically seeking Gabapentin, which is used to treat nerve pain, or Tramadol, which is a pain reliever with narcotic properties. Id. Springs explains that these medications are highly sought after due to their high potential for abuse. Id. As a result, practitioners have strict restrictions about ordering certain medications, which is of special concern at a drug treatment facility. Id.

The plaintiff underwent an MRI of his knee the next day—May 18, 2018—at an outside provider. Dkt. No. 50 at ¶30. According to the MRI report, the nodule could "represent collapsed bursa with adjacent inflammation. Alternatively, [it] may represent a small tendon sheath fibroma." Dkt. No. 78 at 147. The report also noted that a "[n]erve sheath tumor [could] not be entirely excluded." Id. The report concluded that, "This could be managed clinically with repeat imaging if size increases." Id.

On May 20 and 22, 2018, the plaintiff submitted medical requests about his knee pain. Dkt. No. 50 at ¶¶31-32. Nurses informed the plaintiff that he could discuss his concerns with Springs in the near future at the scheduled follow-up appointment. Id. Springs next examined the plaintiff on June 5, 2018 and reviewed the MRI results. Id. at ¶33. According to Springs, there were no objective findings that would indicate that the plaintiff was suffering from a knee condition that would produce the degree of pain he claimed he was experiencing. Id.

Springs explains that the plaintiff's complaints of pain were more consistent with nerve pain than an acute injury. Dkt. No. 50 at ¶34. She explains that based on his complaints, the MRI results and her examination, she decided to increase the plaintiff's prescription for Capsaicin cream, which is for treatment of nerve pain, to .075% and to order consultation with an orthopedic surgeon for further diagnostic testing. Id. She does not explain why—if the plaintiff's complaints were consistent with nerve pain—she declined to prescribe Gabapentin or Tramadol.

Less than a week later, the plaintiff submitted a medical request explaining that his medications were not working. Dkt. No. 50 at ¶35. According to Springs, a nurse responded the next day and reminded him that he was in a drug treatment facility; she advised him that not all pain management interventions would be via drugs. Id. She also reminded him that he was scheduled to see an orthopedic specialist, who would hopefully be able to identify the source of the pain. Id.

On June 20, 2018, orthopedist Dr. Scott Baussuener examined the plaintiff. Dkt. No. 50 at ¶36. Baussuener noted that the plaintiff stated he had noticed the "painful mass" for three to four years, but it had been getting worse and had become painful all day with a lot of pain at night, which prevented him from sleeping. Dkt. No. 78 at 124.

Springs highlights that Baussuener noted the plaintiff's complaints of pain "seemed far out of proportion to what the appearance of the mass is, both radiographically and on clinical exam." Dkt. No. 50 at ¶36; Dkt. No. 78 at 124.

13

Bassuerner further noted that the plaintiff's "report of substantial pain and his concern such as night pain [were] somewhat concerning to [him] as [he does] not think a lesion involving pes anserine inflammation should likely cause that." Dkt. No. 78 at 124. Thus, the plaintiff opines that Baussuener was concerned that his pain was as intense as he said because the complaints weren't consistent with the objective findings about the mass; he did not mean, as Springs suggests, that the plaintiff was exaggerating how much pain he was experiencing. Dkt. No. 69 at ¶36. Bassuerner did not recommend changes to the plaintiff's pain medication. Dkt. No. 50 at ¶36.

Springs explains that she intended to review Bassuerner's findings and recommendation and develop a treatment plan, but the plaintiff was transferred out of Chippewa Valley less than a week later, on June 26, 2018. Dkt. No. 50 at ¶37. Springs had no more control over the plaintiff's medical care after his transfer. Id. at ¶38.

        3.   *Jackson Correctional Institution*

The plaintiff was housed at Jackson from June 26, 2018 until December 10, 2018. Dkt. No. 47 at ¶58. While there, APNP Tidquist saw the plaintiff on several occasions. Id. She was his primary care provider, but he also saw onsite and offsite doctors and nurses and offsite providers. Id.

On July 9, 2018, Tidquist met with the plaintiff and wrote an order for him to be sent to UW Health orthopedic specialists for consultation. Dkt. No. 47 at ¶62. At that time, he was still receiving his prescriptions for Capsaicin

14

cream and Tylenol. Id. The plaintiff saw Dr. Hennessey about two months later,

on September 13, 2018. Id. at ¶63. Hennessey noted in his report:

> He does have a small about 1-cm mobile mass overlying the pes anserinus. This is fairly tender today. The mass is soft and about 1 cm in diameter and feels quite superficial. The knee is stable to ligamentous testing. He has no joint line tenderness. He has full knee range of motion. . . . MRI of the right knee from May was reviewed. He does have a small mass . . . This could be consistent with a fibroma or possibly nerve sheath tumor. There are no overly concerning features on the MRI. Otherwise, MRI is pretty normal. . . . On imaging, this appears to be a small soft tissue mass without any overly concerning features, possibly representing fibroma or nerve sheath tumor. We had a discussion with him about treatment. Notably, we could simply monitor this over time. However, if it is particularly bothersome, we could proceed with excisional biopsy. He is quite bothered by this and so is very interested in surgery. We reviewed the risks and benefits. We will work on getting this set up with the Department of Corrections. This will be done on an outpatient basis and could even potentially be done under local anesthesia. . . .

Dkt. No. 41-6 at 7. Hennessey did not recommend or prescribe any additional

pain medication. Dkt. No. 47 at ¶66.

The plaintiff initiated this lawsuit on October 3, 2018. Dkt. No. 1.

According to the defendants, the plaintiff was being evaluated and treated for

other medical conditions in the fall of 2018. Dkt. No. 47 at ¶70. The plaintiff

explains that he had a routine EGD to check for varices on November 20, 2018,

during which the doctor noted an abnormal patch in his upper esophagus.

Dkt. No. 75 at ¶70. The labs came back on November 26, 2018 and indicated

high grade dysplasia. Id. Tidquist informed the plaintiff on November 28, 2018

that he had proximal esophageal squamous cell carcinoma in situ. Dkt. No. 47

at ¶71. The plaintiff stresses that this happened more than two months after

Hennessey's report. Id.

According to the defendants, the plaintiff's right knee surgery was temporarily postponed to focus on his cancer treatment. Dkt. No. 47 at ¶73. They explain that, because cancer treatment can be a grueling process, elective surgery is not recommended. Id. It could have resulted in additional complications such as infection or delayed healing. Id.

The mass on the plaintiff's knee was removed on May 1, 2019. Dkt. No. 47 at ¶74. It was sent to pathology; it was identified as a schwannoma and was benign. Id. at 76; Dkt. No. 41-6 at 4; Dkt. No. 78 at 143-44. "A schwannoma is a type of nerve tumor of the nerve sheath. It's the most common type of benign peripheral nerve tumor in adults." https://www.mayoclinic.org/diseases-conditions/schwannoma/cdc-20352974; Dkt. No. 80 at ¶22. The plaintiff reports that, once it was removed, the pain stopped, and for the first time in years, he was able to sleep through the night. Dkt. No. 75 at ¶75.

## II. Discussion

### A. Summary Judgment Standard

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986); Ames v. Home Depot U.S.A., Inc., 629 F.3d 665, 668 (7th Cir. 2011). "Material facts" are those under the applicable substantive law that "might affect the outcome of the suit." Anderson, 477 U.S. at 248. A dispute

16

over a "material fact" is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." <u>Id.</u>

A party asserting that a fact cannot be disputed or is genuinely disputed must support the assertion by:

> (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or
>
> (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1). "An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4).

### B.    Deliberate Indifference Standard under the Eighth Amendment

"[T]he Eighth Amendment, as the Supreme Court has interpreted it, protects prisoners from prison conditions that cause the wanton and unnecessary infliction of pain, including . . . grossly inadequate medical care." <u>Gabb v. Wexford Health Sources, Inc.</u>, 945 F.3d 1027, 1033 (7th Cir. 2019) (quoting <u>Pyles v. Fahim</u>, 771 F.3d 403, 408 (7th Cir. 2014)) (internal quotations omitted). The court uses a two-part test to evaluate whether medical care amounts to cruel and unusual punishment; it asks 1) "whether a plaintiff suffered from an objectively serious medical condition" and 2) "whether the

individual defendant was deliberately indifferent to that condition." Id. (quoting Petties v. Carter, 836 F.3d 722, 727-28 (7th Cir. 2016)).

### 1. *Objectively Serious Medical Condition*

The defendants argue that the plaintiff has not presented sufficient evidence to create a triable issue on whether his knee nodule qualifies as an objectively serious medical condition. Dkt. No. 46 at 16; Dkt. No. 49 at 8. They assert that there was "no objective evidence of a serious medical condition" and that "multiple examinations failed to reveal objective findings to support his seemingly overexaggerated claims of pain." Id.

According to the Seventh Circuit, "[T]he following circumstances [are] indications that a prisoner has a serious medical need: The existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic and substantial pain." Hayes v. Snyder, 546 F.3d 516, 522-23 (7th Cir. 2008) (citations and internal quotation marks omitted). The defendants insist that the small nodule was not serious, but they ignore the plaintiff's assertions that it caused him significant pain that affected his daily life activities. Jurors could reasonably conclude that the nodule was objectively serious if they were to credit the plaintiff's testimony that the pain limited his ability to walk and sleep and that the pain worsened over time. See Heard v. Tilden, 774 F. App'x 985, 988 (7th Cir. 2019); Greeno v. Daley, 414 F.3d 645, 655 (7th Cir. 2005) ("there is no requirement that a prisoner provide 'objective' evidence of his pain and

18

suffering—self-reporting is often the only indicator a doctor has of a patient's condition").

<blockquote>2.   *Deliberate Indifference to the Plaintiff's Knee Nodule*</blockquote>

Moving to the second prong of the standard, deliberate indifference requires "more than negligence and approaches intentional wrongdoing." Goodloe v. Sood, No. 18-1910, 2020 WL 255318 at *3 (7th Cir. Jan. 17, 2020) (citations omitted). To survive summary judgment, a plaintiff must present evidence from which a jury could reasonably conclude that "the prison official acted with a sufficiently culpable state of mind, meaning the official knew of or was aware of—but then disregarded—a substantial risk of harm to an inmate's health." Id. (citations omitted).

The Seventh Circuit recently summarized two lines of cases that apply to the events at issue in the case. The first line demonstrates "that an inmate can establish deliberate indifference by showing that medical personnel persisted with a course of treatment they knew to be ineffective." Id. (citing Greeno, 414 F.3d at 654-55). Generally, in that line of cases, prisoners survive summary judgment by showing that officials "failed to conduct necessary tests, ignored specific treatment requests from the inmate, and persisted in offering weak medication—all in the face of repeated protests that the medication was not working." Id. The Seventh Circuit stated, "Put most bluntly, faced with an inmate experiencing ongoing suffering from a serious medical condition, a prison physician cannot 'doggedly persis[t] in a course of treatment known to

be ineffective' without violating the Eighth Amendment." Id. (quoting Greeno, 414 F.3d at 655).

The second line of cases establishes that "'inexplicable delay' in responding to an inmate's serious medical condition can reflect deliberate indifference." Id. at *4. (citing Petties, 836 F.3d at 728). As the Seventh Circuit noted, "That is especially so if that delay exacerbates an inmate's medical condition or unnecessarily prolongs suffering." Id. (citing Williams v. Liefer, 491 F.3d 710, 715-16 (7th Cir. 2007)).

There are two issues at play: 1) What each medical provider did or did not do to diagnose the cause of the plaintiff's pain; and 2) What each medical provider did or did not do to relieve the plaintiff's worsening pain. The court will apply the above described principles to each defendant's response to the plaintiff's condition and complaints of pain.

### a. APNP Frank

It's not clear when the nodule first appeared on the plaintiff's knee, but the evidence demonstrates that the plaintiff began to persistently complain about the pain beginning in early 2017. APNP Frank performed a physical examination and ordered an x-ray. Because the plaintiff already was receiving pain medication for other conditions, Frank states that he did not believe additional medication was warranted.

The x-ray was normal, so Frank ordered a cortisone shot, although—for unexplained reasons—he opted to postpone the shot for three months until the plaintiff received scheduled treatment for his cirrhosis. Frank continued the

20

plaintiff's Tylenol prescription. After the cortisone shot, Frank referred the plaintiff to physical therapy for treatment.

About four months passed. The plaintiff asserts that he was in pain that entire time and that the Tylenol wasn't helping, although it is not clear if the plaintiff complained to Frank about the pain or only to health services staff generally. Apparently, the cortisone shot did not help because, when Frank offered a second shot, the plaintiff declined. The plaintiff asserts that Frank told him that Frank asked Larson if Frank could prescribe better pain medication and/or a sleep aid, but Larson said no.

From April to August 2017, the plaintiff did not mention his knee pain to Frank, suggesting that it hadn't become intolerable. In October 2017, the physical therapist tried iontophoresis, but that did not help. The next month, Frank recommended the plaintiff go to an orthopedic specialist. He also ordered an extra blanket for the plaintiff, so he could place it between his knees to help keep from bumping the nodule while he slept. That was the end of Frank's treatment of the plaintiff.

No reasonable jury could conclude from Frank's actions that he was deliberately indifferent to the plaintiff's medical condition or pain. First, Frank consistently worked toward diagnosing the source of the plaintiff's pain. He conducted physical examinations, ordered x-rays, referred the plaintiff to physical therapy and eventually recommended an orthopedic consult. Second, as the plaintiff's pain persisted and worsened, Frank tried multiple treatments to alleviate the pain. He continued with Tylenol, gave one cortisone shot and

21

offered a second, referred the plaintiff to physical therapy (which tried additional treatment to address the pain), asked Larson for different pain medications and a sleep aid and ordered a blanket to help the plaintiff while he slept. The fact that the treatment by the physical therapist failed, that Larson refused additional medications and that guards refused to give the plaintiff the ordered blanket does not negate the fact that Frank made multiple attempts to address the plaintiff's complaints. These efforts do not support a finding of deliberate indifference. The court will grant summary judgment in favor of Frank.

b. Dr. Larson

The plaintiff did not complain about his knee pain again until mid-January 2018 (about two months after APNP Frank recommended an orthopedic consult), at which time he was seen by Dr. Larson. By this time, the plaintiff had been complaining on and off about the knee nodule and the accompanying pain for about a year. The plaintiff was clear that his pain was getting worse and that the Tylenol was not helping. Larson reviewed the plaintiff's records, which indicated that neither physical therapy nor the cortisone shot had helped. The plaintiff was scheduled to see an orthopedic specialist, and Larson prescribed Capsaicin cream for the pain.

Larson observed the nodule to be small and superficial. He is clear that he did not think the nodule could cause the level of pain that the plaintiff described. When he saw the plaintiff again for complaints of knee pain just six days later, he cancelled the scheduled orthopedic consult and instead

22

scheduled the plaintiff to see Dr. Steliga, a surgeon who could perform minor surgeries in health services. He did not prescribe additional pain medications.

Steliga died before the plaintiff initiated this lawsuit, and his records do not detail his interactions with the plaintiff, so there is little documentary evidence establishing what transpired between them. Larson, who was not at the appointments, asserts that the plaintiff refused to let Steliga perform the nodule removal. The plaintiff, who obviously was at the appointments, asserts that he went to health services multiple times to have the nodule removed and was more than willing to let Steliga perform the removal, but the plaintiff says that Steliga opined that he was not comfortable removing the nodule in health services. What is beyond dispute is that Steliga ordered an x-ray and ultrasound and eventually scheduled the plaintiff for the very orthopedic consult that Larson had cancelled months prior.

The orthopedic specialist requested an MRI and noted that the plaintiff had a "hypersensitive nodule." While he did not make a definitive diagnosis, he opined that the hypersensitivity and location could suggest a nerve-based tumor such as a schwannoma. The plaintiff was transferred to Chippewa Valley about two weeks later. Larson did not make adjustments to the plaintiff's pain medication following the orthopedic consult.

No reasonable jury could conclude that Larson was deliberately indifferent in his efforts to diagnose the source of the plaintiff's pain. Given his observations of the physical characteristics of the nodule, he thought an orthopedic consult was unnecessary and that Steliga could remove the nodule

23

in health services. It appears that Larson was wrong, but being wrong does not mean that he was deliberately indifferent to the condition. The plaintiff emphasizes that Larson's decision to refer him to Steliga delayed the diagnosis and treatment of the nodule, but the delay was not "inexplicable." Rather, the delay was a result of Larson's mistaken belief that Steliga could remove the nodule onsite. Such an assessment may amount to medical malpractice, but "plaintiffs must show more than mere evidence of malpractice to prove deliberate indifference." Petties v. Carter, 836 F.3d 722, 728 (7th Cir. 2016).

A reasonable jury could, however, conclude that Larson was deliberately indifferent to the plaintiff's pain. By the time Larson took over the plaintiff's care, the plaintiff had been complaining about his knee pain and related sleep disturbances for more than a year. Frank had made many efforts to address the pain, but all were unsuccessful—the plaintiff continued to complain that his knee pain was worsening. Larson tried Capsaicin cream, but the plaintiff made additional complaints after that, suggesting that the cream also was insufficient to help with the pain. Even after the orthopedic specialist noted the hypersensitivity of the nodule and suggested it could be a nerve-based tumor, Larson did not prescribe additional pain medications.

Larson asserts that he did not believe that the plaintiff's pain level could be as high as he described. As will become evident, he is not the only defendant who had doubts about the amount of pain the plaintiff claimed to be experiencing. As the plaintiff points out, however, whether he was telling the truth about his pain and whether Larson's reason for refusing to prescribe

24

additional pain medications was because he thought the plaintiff was malingering and did not really have a severe medical need is an issue for the jury. See Greeno, 414 F.3d at 655. Further, in the face of the plaintiff's persistent and increasingly strident requests for pain relief, a jury could reasonably conclude that Larson's unwavering response to the plaintiff's pain was "such a departure from accepted professional judgment, practice or standards as to demonstrate that [he] did not base the decision on such a judgment." Petties, 836 F.3d at 729. The court will not grant summary judgment in Dr. Larson's favor.

### c. Dr. Springs

The court will not grant summary judgment in favor of Dr. Springs for the same reasons it will not grant summary judgment in favor of Larson. Springs made constitutionally adequate efforts to diagnose the source of the plaintiff's pain. Specifically, she allowed his scheduled MRI to go forward. A reasonable jury could conclude, however, that she "persisted in offering weak medication" in response to his complaints of pain. Goodloe, 2020 WL 255318 at *3.

By the time Springs examined the plaintiff, he had been complaining about knee pain for a year and a half. He was explicit that none of the attempts to address his pain had worked. Also, the orthopedic specialist had highlighted the hypersensitivity of the nodule and the possibility that it was a schwannoma, and the MRI results indicated the possibility that the nodule was a nerve sheath tumor or small tendon sheath fibroma. None of the defendants

present any evidence to support a conclusion that these conditions—as opposed to a simple mass or nodule—would not produce pain in the levels described by the plaintiff.

Springs slightly increased the potency of the Capsaicin cream, but otherwise did nothing to address the plaintiff's complaints of pain. Springs expresses her concern that the plaintiff was malingering and merely drug-seeking, but again, whether that was her basis for refusing to prescribe additional pain medications and, if so, whether that assessment substantially departed from accepted professional judgment, practice or standards are questions for a jury.

### d. APNP Tidquist

Like Larson and Springs, APNP Tidquist is not entitled to summary judgment. Her efforts to diagnose the nodule were constitutionally adequate: she ordered an orthopedic consultation, which was the next logical step following the MRI results. A reasonable jury could conclude, however, that she was deliberately indifferent to the plaintiff's pain. Specifically, Tidquist persisted with the same weak pain medications despite the plaintiff consistently complaining about pain for years. Further, despite the orthopedic specialist noting that the nodule "could be consistent with a fibroma or possibly nerve sheath tumor," Tidquist continued the pain medications that the plaintiff persistently explained were not helping. Whether she decided not to change his pain medications because she thought the plaintiff was exaggerating his complaints of pain and whether her assessment that he was

26

malingering substantially departed from accepted professional judgment, practice or standards are questions for a jury.

The plaintiff filed this lawsuit a few weeks after the orthopedic specialist noted that the plaintiff was interested in having the nodule removed because it was bothering him so much. The plaintiff's claim that Tidquist impermissibly delayed scheduling the surgery until after his cancer treatment was complete is not before the court. The plaintiff was not diagnosed with cancer until after he initiated this lawsuit.

e.   Nurses Hentz and Hulstein[4]

The court concludes that Nurses Hentz and Hulstein are not entitled to summary judgment. The plaintiff asserts that he persistently wrote health service requests stating that his knee was very painful and that he needed additional or different pain medication. According to the plaintiff, Hulstein called him to health services and told him that the surgery would not be scheduled. Dkt. No. 77 at ¶¶51, 54.[5] The plaintiff states that she then accused him of lying, faking and exaggerating. Id. at ¶51. The plaintiff asserts that Hentz also yelled at him while waving health services requests in the air, telling

---

[4] The plaintiff also alleges that Nurse Hulstein retaliated against him by filing a bogus conduct report in response to his persistent filing of health service requests. See Dkt. No. 77 at ¶¶60-64. The alleged events giving rise to this claim happened after the plaintiff initiated this case. The alleged retaliation claim is not before the court, so the court will not address that claim.

[5] The plaintiff's filing at dkt. no. 77 is a hybrid of what should be two separate filings. It purports to be both his statement of proposed facts and an unsworn declaration. Dkt. No. 77 at 14. Because the plaintiff is proceeding without a lawyer, the court will overlook this technical violation of the procedural rules.

27

the plaintiff to stop complaining and that everything he was saying was nonsense and gibberish. Id. at ¶¶52, 54.

In Berry v. Peterman, the Seventh Circuit decided that a nurse was not entitled to summary judgment because, despite being aware of the prisoner's ongoing pain and the ineffectiveness of the recommended pain medications, she never consulted with the treating physician to determine whether the plan of care of was appropriate. 604 F.3d 435, 443 (7th Cir. 2010). Instead, the nurse continued to respond to the prisoner's complaints, denying his request for additional treatment. Id. According to the Seventh Circuit, a jury could reasonably question whether the nurse's deference to the treating provider's opinions regarding the plaintiff's complaints of pain were justified. Id. "Although a medical care system requires nurses to defer to treating physicians' instructions and orders in most situations, that deference may not be blind or unthinking, particularly if it is apparent that the physician's order will likely harm the patient." Id.

The court finds that, consistent with Barry, a jury could reasonably question whether Hentz and Hulstein's deference to the plaintiff's primary care providers' decisions not to give the plaintiff additional or better pain medication was justified, especially in light of his persistent and escalating complaints of pain. A jury could also find that their deference was less than justifiable given the specialists' reports acknowledging the hypersensitivity of the nodule and the possibility that the nodule could be a nerve-sheath tumor.

Finally, in Barry, the Seventh Circuit noted that they were not persuaded by the nurse's argument that he lacked authority to make a referral without further approval. 604 F.3d at 443. Similarly, the court is not persuaded Hentz and Hulstein's argument that they had "no authority or reason to alter Tidquest's [sic] medical decisions." Dkt. No. 46 at 18; Dkt. No. 47 at ¶6. Hentz and Hulstein always had the ability to contact the health services supervisory personnel or voice concerns about the plaintiff's increasingly strident pleas for pain relief.

     e.  Non-Treating Officials: Hepp, Whitman, Massen, Nurse Huber

The court will grant summary judgment in favor of Warden Hepp. The plaintiff has not presented sufficient evidence from which a jury could conclude that Hepp was deliberately indifferent to his serious medical needs. Hepp was not involved in determining the appropriate medical care and treatment the plaintiff should receive. His role, as a non-medical official, was to make sure the plaintiff was not being ignored; it was not to second-guess the medical providers' treatment decisions. See Askew v. Davis, 613 F.. App'x 544, 548 (7th Cir. 2015) (holding that administrators are permitted to defer to medical providers' medical opinions). There is no dispute that, in addition to his knee pain, the plaintiff had a very complicated medical history and was regularly being seen by health services and offsite specialists. No jury could reasonably conclude that Hepp was deliberately indifferent to the plaintiff's condition as a result of his deferral to the medical providers' opinion that the plaintiff's

29

condition was not objectively serious and did not warrant additional pain intervention.

The same reasoning applies to health services managers Whitman and Massen. The plaintiff has not satisfied his burden with respect to his claim against them for failing to intervene. Because they provided administrative support rather than direct care, dkt. no. 47 at ¶5, the plaintiff needed to offer evidence that they had reason to doubt that the doctors and nurse practitioners were basing their course of treatment on something other than medical judgment. Heard v. Tilden, 774 F. App'x 985, 988–89 (7th Cir. 2019) (citations omitted). The evidence demonstrates that the health services managers (particularly Whitman) were in regular contact with the plaintiff's medical providers, who opined that they did not believe the plaintiff was being honest in reporting his levels of pain and that the prescribed pain medications were adequate. Even if Whitman and Massan disagreed with the medical providers' assessments, a disagreement with the providers' treatment plan would not have warranted intervention. Id.; See Rasho v. Elyea, 856 F.3d 469, 478–79 (7th Cir. 2017) (medical director may rely on judgment of "medical professionals treating an inmate"). Accordingly, no reasonable jury could conclude that Whitman and Massan failed to intervene with deliberate or reckless disregard.

The court also will grant summary judgment in favor of Nurse Huber. According to the plaintiff, he wrote to Huber on July 5, 2018, because she is in charge of scheduling outside surgeries. Dkt. No. 80 at ¶51. He asked her if the

surgery had been scheduled, and she told him that it had. Id. It appears that Huber's role was merely administrative—she made no treating decisions and was not involved in developing the plaintiff's plan of care or responding to the plaintiff's health service requests. See Vance v. Peters, 97 F.3d 987, 991 (7th Cir. 1996) ("Section 1983 creates a cause of action based on personal liability and predicated upon fault; thus, liability does not attach unless the individual defendant caused or participated in a constitutional deprivation.") Further, according to the plaintiff, Huber scheduled the appointment; it was Hulstein who told him the surgery would not be scheduled. No reasonable jury could conclude from Huber's response that she was deliberately indifferent to his condition.

## III.    Conclusion

The court **GRANTS** the defendants' motions for summary judgment in favor of Candace Whitman, Randall Hepp, Robert Frank, Tammy Massen and Diane Huber. Dkt. No. 40. The court **ORDERS** that those defendants are **DISMISSED**.

The court **DENIES** the motions of Dr. Charles Larson, Deborah Tidquist, Anthony Hentz and Pauline Hulstein for summary judgment. Dkt. No. 40.

The court **DENIES** the motion for summary judgment filed by Dr. Fern Springs. Dkt. No. 48.

The court will recruit a lawyer to represent the plaintiff on his surviving claims. The court cautions the plaintiff to be patient; it is often difficult to find lawyers willing and able to represent plaintiffs on a volunteer basis. Once the

31

court has found counsel and the plaintiff has signed a form agreeing to reimburse the *pro bono* fund for expenses, the court will schedule a hearing to discuss next steps.

Dated in Milwaukee, Wisconsin this 29th day of September, 2020.

**BY THE COURT:**

**HON. PAMELA PEPPER**
**Chief United States District Judge**